**Christopher L. Cauble,** OSB No. 962374
ccauble@thecaublefirm.com
**CAUBLE, SELVIG, & WHITTINGTON LLP**
**Portland Office**
1205 NW 25th Ave
Portland, OR
Telephone: (541) 476-8825
Facsimile: (541) 471-1704
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LUCAS S. CARRILLO, Personal Representative of the Estate of Aaron Joseph Danielson, | Case No.: |
| Plaintiff, | **COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE** |
| v. | **JURY TRIAL DEMANDED** |
| THE CITY OF PORTLAND, a municipal corporation; MICHAEL SCHMIDT, an individual; and EDWARD TEVIS (TED) WHEELER, an individual. | |
| Defendants. | |

COMES NOW Plaintiff, by and through his attorneys of record, alleges that at all

relevant times:

### NATURE OF THE CASE

1.

The right to peaceable assembly and free speech are preserved in the United States

Constitution.  Plaintiff supported said rights, and this suit does not seek to undermine the

message or messages from any groups who were engaged in demonstrations in the city of

Portland's downtown core throughout 2020.  However, the constitutional rights of

peaceable assembly and free speech are not absolute and must be balanced against human health and safety.  It is the duty of the police in Portland to preserve the public peace, prevent crime, protect rights of persons and property, and preserver order.

2.

This suit concerns the constitutional rights of Plaintiff who lost his life due to events which would not have occurred but for the dereliction of duty by City of Portland and decision of Multnomah County leadership in declining to enforce public safety laws during demonstrations in Portland's downtown core.  The City's decisions, combined with the public statements of the District Attorney of Multnomah County, indicated a tolerance for, and deliberate indifference toward illegal activity associated with demonstrations.

3.

The mayor and police commissioner, Defendant Ted Wheeler, showed his awareness of the substantial risk of physical harm that would probably result from the multiple months of demonstrations in a press statement less than a month before Aaron Danielson was killed. On or about August 6th, 2020, Defendant Wheeler stated that "[y]ou are not demonstrating—you are attempting to commit murder," in a news conference along with Portland Police Bureau Chief Chuck Lovell.  During the press conference, Defendant Wheeler warned that the city anticipated more attacks in the immediate future.  However, despite this recognition by Defendant Wheeler of the known risk of harm, Defendant City maintained its hands-off approach to responding to demonstrations by maintaining the police bureau's strategy to limit police intervention in

protests and counter-demonstrations.  The minimal police presence did not possess the adequate training to properly engage and coordinate with demonstrators or properly control crowds when tensions predictably would escalate.  In the face of valid criticisms of the Portland Police's use of force and crowd control tactics, the Bureau dug down further on its strategy of inconsistent and minimal applications of policing in the core area of downtown Portland around the Justice Center. More troubling, the police Bureau and City leadership broadcast their intentions to sideline themselves in advance.

4.

Defendants created a vacuum where peacekeeping efforts and criminal accountability should be; in its place, an environment of vigilantism emerged that ultimately led to the death of Aaron Danielson and could lead to further loss of the lives of civilians across the political spectrum, who should be able to exercise their constitutional rights without criminal interference.

**PARTIES**

5.

Plaintiff is the estate of Aaron Joseph Danielson (hereinafter "Decedent Danielson"), an estate established in the State of Washington after Mr. Danielson's death. Plaintiff is a resident of Spokane County, Washington. Decedent Danielson was a resident of Portland, Multnomah County, Oregon.  Decedent Danielson's death occurred in Portland, Multnomah County, Oregon.

6.

Defendant City of Portland ("Defendant City") is a municipal corporation

organized under the laws of the State of Oregon.

7.

Defendant Commissioner & Mayor Wheeler ("Defendant Wheeler") was and is at all relevant times, both the Commissioner of the Portland Police Bureau ("PPB") and Mayor of the City of Portland, Oregon.

8.

District Attorney Michael Schmidt ("Defendant Schmidt") was and is at all relevant times, the District Attorney for Multnomah County, Oregon.

## JURISDICTION AND VENUE

9.

Jurisdiction is proper in this Court pursuant to 28 U.S. Code sec. 1331 based on the fact that the Complaint raises federal constitutional questions, specifically the Fourteenth Amendment of the United States Constitution and federal questions pursuant to 42 U.S. Code sec. 1983.  Supplemental jurisdiction over Oregon state law claims is proper based on 28 U.S. Code sec. 1367.

10.

Venue is proper in the U.S. District Court for the District of Oregon based on the fact that all parties are domiciled in Oregon because the events detailed in this complaint occurred within the state of Oregon and all of the Defendants are residents of Oregon. Venue is proper in the Portland subdivision based on the fact that all Defendants are residents of Multnomah County, Oregon, based on LR 3-2.

//

//

//

## FACTUAL ALLEGATIONS

### 11.

The downtown core of the City of Portland was the location of nightly demonstrations since on or about late May 2020 to November 15, 2020, shortly after the murder of George Floyd by Minneapolis Police Department officers.

### 12.

During this time, Defendant Schmidt issued a District Attorney's statement to "presumptively decline to prosecute cases that don't involve deliberate property damage, theft, or threat of force against another person."

### 13.

Over the following months, tensions between rival demonstrators continuously grew, escalating in physical and property violence later in the evenings, regardless of whether the demonstration was planned in advance or not.

### 14.

On or around the evening of August 29, 2020, Decedent Danielson is walking with an individual named Chandler Pappas. Decedent Danielson and Pappas walk from the east on Southwest Alder Street and turn south onto Southwest Third Avenue. An individual named Michael Forest Reinoehl, also walking southbound ahead of Decedent Danielson and Pappas, conceals himself in the entryway of a parking garage. Decedent Danielson and Pappas, not appearing to interact or communicate with anyone, continue walking southbound past where Reinoehl has concealed himself. Watching Decedent Danielson and Pappas walk by, Reinoehl emerges from the garage entryway and without

provocation, confronts Danielson and Pappas.  Reinoehl then shoots twice at Decedent Danielson at close range.  Simultaneously, Decedent Danielson deploys a defensive spray device in the direction of Reinoehl.  Decedent Danielson is struck in the chest and shortly thereafter dies at the scene from his gunshot wounds.

15.

On or around July 5, 2020, Reinoehl was arrested during protest-related activities by the PPB and charged with possessing and concealing a loaded firearm in public, resisting arrest, and interfering with a public safety officer.  During his arrest, PPB seized a 9mm semi-automatic handgun from Reinoehl, for which he had no permit.  In a later telephone interview with PPB, Reinhoel stated that he came down to the protest because he had heard the Proud Boys were around and he needed to make a presence.

16.

On information and belief, Reinoehl and others were known to Defendants to provide security services for demonstrators affiliated with left-leaning Anti-fascist ("Antifa") and Black Lives Matter ("BLM") movements.  On information and belief, Defendants knew that right-leaning protest groups, such as Patriot Prayer and the Proud Boys also had individuals who provided security services.  On information and belief, Defendants knew these security details were assessing and responding not just to internal threats in their respective groups, but also external threats to their respective groups.

17.

On information and belief, Defendants Wheeler and City delegated actual or apparent authority to these private security details to engage in crowd control and crime

prevention at demonstrations, and to "self-police."  In essence, Defendants created symbiotic relationships with these private security groups, in which all parties involved were joint participants in the enterprise of crowd control and crime prevention at the demonstrations.

18.

Defendants were aware in advance of a large-scale demonstration scheduled to take place on August 29, 2020, and that the demonstration would involve participants driving a caravan through the city.  On information and belief, Defendants were aware in advance that counterprotests were planning to demonstrate in Portland's downtown core. The primary group of demonstrators in their vehicles deviated from the route which they had initially disclosed to the city and drove into Portland's downtown core.

19.

On information and belief, Defendants knew or had reason to suspect that vehicles from the caravan rally would deviate from the disclosed route and head to Portland's downtown core.

20.

Less than an hour before Decedent Danielson's homicide, PPB put out a message on the social media platform Twitter, warning that a political rally is caravanning throughout downtown Portland and that there have been some instances of violence between demonstrators and counterdemonstrators.  PPB followed up with a sub-Tweet to avoid downtown, if possible.

21.

However, despite possessing advanced knowledge of these competing, active demonstrations taking place and – on information and belief – a reasonable anticipation that these two groups would collide later in the evening in downtown Portland, Defendants City and Wheeler deployed a minimal PPB presence. Additionally, Defendants City and Wheeler handed down operational orders to PPB officers in the Rapid Response Team ("RRT") to "stay out of sight" and allow the demonstrators and protestors to "express their emotions."

22.

At the same time Reinoehl confronted and killed Decedent Danielson, there was an RRT squad of officers located within less than a 2-block radius of the shooting. On information and belief, these officers were following the operational orders from Defendants to standby, stay out of sight, and not become involved in interactions between demonstrators.

23.

On information and belief, Defendants' policies of non-intervention were known to demonstrators, some of whom felt emboldened to engage in unlawful activities without fear of reprisal from PPB. As a result, demonstrators proceeded to assault one another and members of the public with chemical irritants, makeshift weapons, and other items with impunity.

24.

PPB claims that its lack of presence in core downtown Portland areas, such as the

blocks surrounding the Justice Center building, was because Alt Right extremists came into the area dressed in fatigues, "creating an extremely high risk of a police-on-police casualty given the dress of the federal officers."  However, PPB's justifications appear to conflict with directives from City leadership.   Defendant Wheeler, seemingly preoccupied with maintaining political cover amidst the protests, proposed in or about mid-July 2020 that PPB not to engage with crowds around the Justice Center unless a life safety situation develops, "[t]hat way people will know that it is the feds that are out on the streets and not us.  If it goes badly tonight then we can say with a straight face that we made a sincere attempt to de-escalate."  Defendant Wheeler had real-time knowledge of the continuing escalation of violence at the nightly demonstrations, stating that the city "need to find some way to break the current dynamic which will lead to someone getting killed."

25.

Later, in or about early-August 2020, Defendant Wheeler communicated a desire to focus the City's resources on gun violence yet have the PPB "stay out of sight unless something happens."

26.

During the months of nightly demonstrations, PPB had a policy, pattern, and/or practice of maintaining a smaller police presence during events held by right-leaning groups.   On information and belief, Defendants did not take corrective measures to correct this pattern.

27.

On or around August 22, 2020, "No Marxism in America Rally" and "Trump 2020 Cruise Rally" events were held in the downtown core of Portland outside the Justice Center. On information and belief, Defendants had advanced knowledge of these events and knew that left-leaning counter-protestors would gravitate to these events. Yet, PPB only deployed thirty officers for crowd control, who largely stood by as the violence escalated. During these events, demonstrators and counter-demonstrators physically clashed on the streets with weapons, smoke bombs, shields, and chemical irritants. An individual named Alan Swinney brandished a revolver at counter-protesters during the height of the clash between the groups. Another individual, Tusitala "Tiny" Toese, who had an active warrant for his arrest due to probation violations, was purposefully not arrested by PPB during this event.

28.

Even though PPB determined that the events on August 22, 2020 fit the definition of a riot, PPB refused to declare the event a riot. Instead, federal officers declared an unlawful assembly and cleared the crowds from the federally-owned Chapman Square later in the afternoon.

29.

Given the enormity of the press coverage over the past several years regarding clashes between left- and right-leaning protest groups in the downtown core of Portland, Defendants knew or should have known that violent clashes would occur. Furthermore, the preferential treatment given to the right-leaning groups by PPB was common

knowledge among rival demonstrators, as documented across social media and news outlets.  Yet, despite this knowledge and despite the escalation of the violence one week prior, PPB did not change its tactics for the planned rally on August 29, 2020.

30.

Defendants fostered an environment in which demonstrators on both sides could reasonably anticipate a skeletal and passive police presence on the weekend of August 29, 2020.

31.

On information and belief, Defendants City and Wheeler did not instruct PPB to divert the caravan of right-leaning demonstrators away from downtown Portland on the night of August 29, 2020, despite the fact that PPB has used the tactic of diverting vehicular and/or foot traffic in previous left-leaning demonstrations to protect City property.

32.

According to a PPB's own communications to the public, on August 14, 2020, a group of a few hundred people gathered in Peninsula Park.  PPB believed the group had the intent of marching to the Portland Police Association (PPA) offices.  In response, PPB officers positioned themselves to block the marchers' access to the PPA office. When the group attempted to march to the North Precinct on Northeast Emerson Street, officers blocked their path again.

33.

On information and belief, Defendants encouraged and fostered a culture of

nonenforcement of generally applicable public safety laws, while also supporting a cooperative relationship between particular groups of demonstrators and the police. Instead of self-policing, this environment fostered a culture of vigilante policing between the opposing factions, which filled the void created by a lack of actual policing.

34.

On information and belief, during all relevant times Defendants failed to require all Incident Commanders and Deputy Incident Commanders to attend Public Order Training to develop a working knowledge of appropriate crowd control tactics.

**FIRST CLAIM FOR RELIEF – Procedural Due Process**
**Deprivation of Civil Rights – 42 U.S.C. § 1983**

**(All Defendants)**

35.

Plaintiff realleges and incorporates the above as set forth in full paragraphs 1-34.

36.

Decedent Danielson was deprived of rights guaranteed to him under the United States Constitution by Defendants, acting under color of state law, in one or more of the following particulars:

a. Decedent Danielson was deprived of his right to bodily integrity under the Fourteenth Amendment;

b. Decedent Danielson was deprived of his right to assemble peaceably free from retaliation under the First Amendment;

c. Decedent Danielson was deprived of his right to speak free from retaliation under the First Amendment; and

d. Decedent Danielson was deprived of his right to equal protection of the law under the Fourteenth Amendment;

37.

The deprivation of constitutional rights set forth above was caused by Defendants in one or more of the following ways:

a. As to Defendant Schmidt, in adopting and maintaining a policy to "presumptively decline to prosecute cases that don't involve deliberate property damage, theft, or threat of force against another person," and broadcasting this policy to the general public in advance of what Defendants knew to be continuous nightly demonstrations;

b. As to Defendants Wheeler and City, by and through PPB, in eschewing legitimate community complaints regarding PPB's crowd control tactics, and in response, adopting and maintaining policies, customs and/or practices to provide only a skeletal police presence with orders to stay out of sight and apart from demonstrators, in part to provide political cover for the City and its administration;

c. As to Defendants Wheeler and City, in adopting and maintaining policies, customs and/or practices to provide preferential treatment to certain demonstration groups, including warning individuals of pending warrants, overlooking criminal activity that posed a direct, imminent threat to the public,

and reducing PPB presence even further during demonstrations, even when the threat of opposing demonstration groups clashing was imminent and known to Defendants and leading all groups involved to preemptively and defensively arm themselves;

d. As to Defendants Wheeler and City, in failing to adopt and maintain adequate policies regarding crowd control and use of force;

e. As to Defendants Wheeler and City, in failing to employ previously-used crowd diversion tactics on the weekend of August 29, 2020 that could have prevented the vehicles from the caravan from splintering off into downtown Portland, which led to the deterioration of conditions between rival demonstration groups in the downtown Portland core and ultimately Decedent Danielson's death;

f. As to all Defendants, in adopting and maintaining policies, customs, and/or practices that fostered an environment in which demonstrators on both sides could reasonably anticipate a skeletal and passive police presence on the weekend of August 29, 2020, where demonstrators knew they could engage in criminal activity without reprisal from Defendants;

g. As to Defendants Wheeler and City, in failing to adopt and maintain policies to investigate and address the armed private security details of demonstration groups;

h. As to Defendants Wheeler and City, in delegating their sovereign duties of policing, such as crowd control and crime prevention, to armed private security details within demonstration groups; and

i. As to Defendants Wheeler and City, in instructing the PPB RRT to "stay out of sight" and let the demonstrators "express their emotions" on the night of August 29, 2020, which led to the events that caused Decedent Danielson's death.

38.

As a result of the constitutional deprivations caused by Defendants, Decedent Danielson, as he lay dying in the streets of Portland, experienced suffering, emotional torment, fear, panic, and ultimately a painful death, to Plaintiff's noneconomic damage to be determined fair by the trier of fact, not to exceed $1,000,000.

39.

Plaintiff is entitled to recover his necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

### SECOND CLAIM FOR RELIEF
### Common Law Torts – Negligence

### (All Defendants)

40.

Plaintiff realleges and incorporates the above as set forth in full paragraphs 1-39.

41.

Defendants were negligent in one or more of the following particulars:

a. As to Defendant Schmidt, in adopting and maintaining a policy to "presumptively decline to prosecute cases that don't involve deliberate property damage, theft, or threat of force against another person," and broadcasting this policy to the general public in advance of what Defendants knew to be continuous nightly demonstrations;

b. As to Defendants Wheeler and City, by and through PPB, in eschewing legitimate community complaints regarding PPB's crowd control tactics, and in response, adopting and maintaining policies, customs and/or practices to provide only a skeletal police presence with orders to stay out of sight and apart from demonstrators, in part to provide political cover for the City and its administration;

c. As to Defendants Wheeler and City, in adopting and maintaining policies, customs and/or practices to provide preferential treatment to certain demonstration groups, including warning individuals of pending warrants, overlooking criminal activity that posed a direct, imminent threat to the public, and reducing PPB presence even further during demonstrations, even when the threat of opposing demonstration groups clashing was imminent and known to Defendants and leading all groups involved to preemptively and defensively arm themselves;

d. As to Defendants Wheeler and City, in failing to adopt and maintain adequate policies regarding crowd control and use of force;

e.  As to Defendants Wheeler and City, in failing to employ previously-used crowd diversion tactics on the weekend of August 29, 2020 that could have prevented the vehicles from the caravan from splintering off into downtown Portland, which led to the deterioration of conditions between rival demonstration groups in the downtown Portland core and ultimately Decedent Danielson's death;

f.  As to all Defendants, in adopting and maintaining policies, customs, and/or practices that fostered an environment in which demonstrators on both sides could reasonably anticipate a skeletal and passive police presence on the weekend of August 29, 2020, where demonstrators knew they could engage in criminal activity without reprisal from Defendants;

g.  As to Defendants Wheeler and City, in failing to adopt and maintain policies to investigate and address the armed private security details of demonstration groups;

h.  As to Defendants Wheeler and City, in negligently delegating their sovereign duties of policing, such as crowd control and crime prevention, to armed private security details within demonstration groups; and

i.  As to Defendants Wheeler and City, in instructing the PPB RRT to "stay out of sight" and let the demonstrators "express their emotions" on the night of August 29, 2020, which led to the events that caused Decedent Danielson's death.

42.

Plaintiff timely provided notice to Defendants under the Oregon Tort Claims Act.

43.

As a result of Defendants', and each of their, negligence, Decedent Danielson suffered lost future income, to Plaintiff's economic damage to be determined fair by the trier of fact, not to exceed $1,500,000.

44.

As a result of Defendants', and each of their, negligence, Decedent Danielson, as he lay dying in the streets of Portland, experienced suffering, emotional torment, fear, panic, and ultimately a painful death, to Plaintiff's noneconomic damage to be determined fair by the trier of fact, not to exceed $500,000.

**JURY DEMAND**

Plaintiff demands a trial by a jury.

//

//

//

WHEREFORE, PLAINTIFF requests the following relief:

1. As to Plaintiff's first claim for relief, non-economic damages in an amount to be determined fair by the trier of fact, not to exceed $1,000,000;

2. As to Plaintiff's second claim for relief, economic damages in an amount to be determined fair by the trier of fact, not to exceed $1,500,000;

3. As to Plaintiff's second claim for relief, non-economic damages, in an amount to be determined fair by the trier of fact, not to exceed $500,000;

4. Punitive damages, in an amount to be determined fair by the trier of fact, not to exceed $10,000,000;

5. Plaintiff's costs of investigation, costs of suit, and reasonable attorney's fees; and

6. Such other and further relief deemed just and equitable.

DATED: September 10, 2021.

CAUBLE, SELVIG & WHITTINGTON, LLP


By: _/s/Christopher L. Cauble_____
    **Christopher L. Cauble**, OSB No. 96237
    ccauble@thecaublefirm.com
    CAUBLE, SELVIG & WHITTINGTON, LLP
    1205 NW 25th Avenue
    Portland, OR 97210
    Telephone: (541) 476-8825
    Facsimile: (541) 471-1704


    Of Attorneys for Plaintiff